UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

LUIS CARDENAS-ORNELAS,

Plaintiff,

v.

WICKHAM, *et al.*,

Defendants.

Case No. 2:21-cv-00030-ART-VCF

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Pro se* Plaintiff Luis Cardenas-Ornelas ("Cardenas-Ornelas") brings this action under 42 U.S.C. § 1983 against Defendants Jessie Brightwell ("Brightwell"), Charles Daniels ("Daniels"), Calvin Johnson ("Warden Johnson"), Timothy Johnson ("Officer Johnson"), Robert Owens ("Owens"), Gary Piccinini ("Piccinini"), Manuel Portillo ("Portillo"), Timothy Struck ("Struck"), and Harold Wickham ("Wickham") (collectively, "Defendants") for alleged constitutional violations that occurred while Plaintiff was quarantined at High Desert State Prison ("HDSP") during the Covid-19 pandemic.

Before the Court is Defendants' motion for summary judgment (ECF No. 84), Plaintiff's response (ECF No. 87), and Defendants' reply (ECF No. 93). For the reasons stated below, the Court grants in part and denies in part Defendants' motion for summary judgment.

## I. BACKGROUND

Cardenas-Ornelas is an inmate in custody of the Nevada Department of Corrections ("NDOC"). (ECF No. No. 1-1.) The events giving rise to this action took place in 2020 while Cardenas-Ornelas was housed at High Desert State Prison ("HDSP"). (*Id.*)

In January 2021, Cardenas-Ornelas filed the complaint in this case,

1

asserting six counts under 42 U.S.C. § 1983 and seeking injunctive relief, declaratory relief, and monetary damages. (ECF No. 1-1.) After screening the complaint, the Court allowed Cardenas-Ornelas to proceed with two claims under Count Two; one claim under Count Four; one claim under Count Five; and two claims under Count Six. (ECF No. 12.)

Under Count Two, the Court allowed Plaintiff to proceed with a claim that Defendants Portillo, Owens, Warden Johnson, Struck, and Piccinini violated Plaintiff's Eighth Amendment and the Nevada constitution's prohibition against cruel and unusual punishment by denying Plaintiff yard time and outdoor exercise (2A); and a claim that Defendants Portillo, Owens, Warden Johnson, Struck, and Piccinini violated the federal and state constitutional right to equal protection by providing yard time to inmates other than Plaintiff (2B). Under Count Four, the Court allowed Plaintiff to proceed with his claim that that Defendants Daniels, Warden Johnson, Piccinini, and Struck violated the Eighth Amendment by requiring officers to come to work after they had reported coming into contact with people who had Covid-19. Under Count Five, the Court allowed Plaintiff to proceed with his claim that Defendant Officer Johnson violated the First Amendment by interfering with mail. Under Count Six, the Court allowed Plaintiff to proceed with (6A) a claim that Daniels, Wickham, Warden Johnson, Piccini, Struck, Portillo, Brightwell and Owens violated the First Amendment and Nevada constitution by denying all phone calls; and (6B) a claim that Defendant Warden Johnson violated Plaintiff's equal protection rights by denying him phone calls but allowing other inmates to make phone calls.

In October 2023, Defendants filed a motion for summary judgment, seeking to dismiss Plaintiff's claims as meritless; barred because of failure to exhaust administrative remedies; and barred by qualified immunity. (ECF No. 84.) Plaintiff

2

filed a response in opposition to the motion for summary judgment. (ECF No. 87.) Defendants filed a reply. (ECF No. 93.)

## II. LEGAL STANDARD

### A. SUMMARY JUDGMENT

A party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id.* at 248. Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). However, if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex*, 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.' . . . In such a case, the moving party has the initial burden of establishing the absence of a

3

genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). When the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25.

If the moving party satisfies its initial burden, the burden shifts to the nonmoving party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, they must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III.      COUNT 2A: DENIAL OF YARD TIME

#### A. FACTS

On March 18, 2020, Cardenas-Ornelas's Unit—Unit 9—was placed on quarantine because a canteen staff member tested positive for Covid-19, and inmate canteen workers assigned to Unit 9 had been in close contact with them.

4

(ECF Nos. 84 at 5, 84-1 at 75, 229.) Cardenas-Ornelas claims that this decision was made by Defendants Portillo, Owens, Warden Johnson, Struck, and Piccinini. (ECF Nos. 1-1 at 12, 12 at 11.) This quarantine lasted until April 27, 2020, when Unit 9 inmates were permitted to work but denied yard time. (ECF Nos. 1-1 at 12, 84-1 at 75, 87 at 3.) On May 19, 2020, Unit 9 was placed on lockdown again after one inmate tested positive for Covid-19. (ECF Nos. 84 at 5, 84-1 at 229.) On May 26, 2020, four inmates tested positive for Covid-19, and all HDSP inmates were isolated for a minimum of twenty days. (ECF No. 84-1 at 229-30.)

During this time, Cardenas-Ornelas claims that he was denied all yard time but required to go to work, where there were at least 130 inmates working together in a warehouse and where social distancing was impossible. (ECF No. 1-1 at 12.) Cardenas-Ornelas was paid for work at the Prison Industries card room and hanger room at HDSP for most weeks from June 1, 2020 to July 30, 2021. (ECF No. 87-1 at 43-46.) Cardenas-Ornelas claims that during this time he had multiple conversations with defendants Portillo and Struck regarding the issue of being sent to work while being denied yard time. (ECF No. 1-1 at 12.) Defendants said that the entire lockdown and ban on yard time was due to Covid-19 but did not explain why inmates were denied outdoor exercise while being allowed to work indoors. (*Id.*) Portillo and Struck do not deny or admit having these conversations. (*See* ECF No. 84-1 at 235-36, 255-56.) By June 23, 2020, inmates in other units were permitted to resume yard time, but Unit 9 remained in quarantine. (ECF No. 84-1 at 230.)

On June 12, 2020, Cardenas-Ornelas filed an informal grievance complaining about having been "confined to [his] cell for 23 to 23 ½ hours a day except for . . . work which is for 8 to 9 hours in a crowded warehouse with about

130 other [i]nmates." (ECF No. 84-1 at 74.) On July 27, Struck denied that grievance, citing health and safety reasons. (*Id.*) On August 12, Cardenas-Ornelas filed a first level grievance, reiterating his original complaints. (*Id.*) On August 20, Warden Johnson denied that grievance, stating that "NDOC has not placed any institution on lock-down but has quarantined in an effort to adhere to important Center for Disease Control and prevention guidelines." (*Id.* at 75) In his response, Warden Johson explained that [a]fter receiving medical clearance, Unit 9 inmate workers received authorization to return to work as early as April 27, 2020." (*Id.*) Warden Johnson did not explain why the return to work was not accompanied by a return to yard time. (*See id.*; ECF No. 1-1 at 14.) Cardenas-Ornelas filed a second level grievance, which Wickham denied, finding that his grievance had been "answered correctly at the informal and first levels." (ECF No. 84-1 at 76.)

Cardenas-Ornelas claims that between March 18, 2020 and July 27, 2021, he has been denied all outdoor exercise except for about 20 hours. (ECF No. 87 at 3.) Cardenas-Ornelas claims that during this time, Defendants permitted every other unit within NDOC to continue receiving yard time. (ECF No. 1-1 at 15.) Defendants challenge these claims but do not offer evidence regarding Unit 9's access to yard time after June 2020. (*See* ECF No. 84 at 17, 6.)

### B. EIGHTH AMENDMENT

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which [the prisoner] is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To successfully challenge the conditions of confinement under the Eighth Amendment, a plaintiff must meet both an objective and subjective test. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).

The Ninth Circuit has "recognized that exercise is one of the basic human necessities protected by the Eighth Amendment." *Norbert v. City & County of San Francisco*, 10 F.4th 918, 928–29 (9th Cir. 2021) (citation and internal quotation marks omitted). "Deprivation of outdoor exercise violates the Eighth Amendment rights of inmates confined to continuous and long-term segregation." *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996) (citing *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979)), *amended by* 135 F.3d 1318 (9th Cir. 1998); *see also Thomas v. Ponder*, 611 F.3d 1144, 1151–52 (9th Cir. 2010); *Richardson v. Runnels*, 594 F.3d 666, 672 (9th Cir. 2010); *Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005); *Lopez v. Smith*, 203 F.3d 1122, 1133 (9th Cir. 2000) (en banc); *Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1995); *Allen v. City of Honolulu*, 39 F.3d 936, 938–39 (9th Cir. 1994); *LeMaire v. Maass*, 12 F.3d 1444, 1457–58 (9th Cir. 1993); *Toussaint v. Yockey*, 722 F.2d 1490, 1492–93 (9th Cir. 1984).

The prolonged deprivation of outdoor exercise to inmates confined to continuous and long-term segregation meets the objective prong of the Eighth Amendment. *Keenan*, 83 F.3d at 1089; *LeMaire*, 12 F.3d at 1458 ("the long-term deprivation of *outside* exercise for inmates is unconstitutional"). By contrast, "a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation." *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (the denial of exercise for 21 days was not a violation of the Eighth Amendment). In *Spain v. Procunier*, the Ninth Circuit held that confinement of prisoners who were assigned to the "adjustment center" "for a period of [four] years without opportunity to go outside except for occasional court appearances, attorney interviews, and hospital appointments" was cruel and unusual punishment. *Spain*, 600 F.2d at 192, 200. In *Toussaint v. Yockey*, the Ninth Circuit upheld a preliminary injunction requiring the state to provide "outdoor exercise" where prisoners, who

had been held in administrative segregation for over a year, were "confined to their cells for as much as 23 ½ hours a day." *Toussaint*, 722 F.2d at 1492-3. Prison officials may restrict outdoor exercise on the basis of weather, unusual circumstances, or disciplinary needs. See *Spain*, 600 F.2d at 199. However, "[t]he cost or inconvenience of providing adequate [exercise] facilities is not a defense to the imposition of a cruel punishment." *Id.* at 200.

As to the subjective prong of the Eighth Amendment analysis, prisoners must establish prison officials' "deliberate indifference" to unconstitutional conditions of confinement to establish an Eighth Amendment violation. *See Farmer*, 511 U.S. at 834; *Wilson*, 501 U.S. at 303. To demonstrate that a prison official was deliberately indifferent to a serious threat to an inmate's health and safety, the prisoner must show that the "the official [knew] of and disregard[ed] an excessive risk to inmate . . . safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference. *Farmer*, 511 U.S. at 846.

### C.  STATE CONSTITUTIONAL CLAIMS

The Court allowed Cardenas-Ornelas to proceed with associated claims under the Nevada Constitution because courts apply the same legal standards to the cruel and unusual punishment provision in Article 1, Section 6 of the Nevada Constitution as they do to the Eighth Amendment. (ECF No. 12 at 15.)

Defendants argue that this Court lacks jurisdiction to consider Cardenas-Ornelas's state law claims because they are barred by sovereign immunity under the Eleventh Amendment. (ECF No. 84 at 8.) Defendants explain that Nevada has conditioned its waiver of sovereign immunity on meeting the requirements of NRS 41.031-41.0337, which require that that the plaintiff "name the state as a party to any state tort claims" against state employees and entities. (*Id.*); *Craig v.*

*Donnelly*, 135 Nev. 37, 38 (Nev. App. 2019). Plaintiff's damages claim arising out of the Nevada Constitution, however, may proceed against state employees in their personal capacities. *Mack v. Williams*, 522 P.3d 434, 448 (2022) (rejecting defendants' assertion that state tort law provides meaningful redress for invasions of the constitutional rights at issue).

In *Mack*, the Nevada Supreme Court held that a plaintiff may bring a private action against state actors for damages under Article 1, Section 18 of the Nevada Constitution (which is substantively identical to the Fourth Amendment of the U.S. Constitution). *Mack*, 522 P.3d at 442, 451. In reaching that conclusion, the court "recognize[d] that it is not necessary for the Nevada Constitution to expressly confer such a remedy, nor for the Nevada Legislature to expressly authorize one, because the search-and-seizure rights are self-executing limitations on, and thus inherently enforceable against, arbitrary abuse of government power." *Id.* at 451. The court did not address whether a private right of action exists under other provisions of the Nevada Constitution. *See id.* at 441. However, the court adopted a "framework for answering whether a self-executing provision of the Nevada Constitution is enforceable through a damages remedy" based on California's framework for the same inquiry, as set out in *Katzberg v. Regents of Univ. of Cal.,* 58 P.3d 339 (2002). *Id.* at 444-45, 451. This framework involves asking first "whether the language and history of the at-issue constitutional provision establishes an affirmative indication of intent to provide or withhold the requested remedy." *Id.* at 451. If it does not, the court then considers "whether the several factors set forth in § 874A of the Restatement (Second) of Torts favor the requested remedy." *Id.* If consideration of those factors favors a damages action, the court finally considers "whether any special factors counsel hesitation against recognition." *Id.* at 452.

Nevada courts do not appear to have undertaken an analysis of Article 1, Section 6 of the Nevada Constitution under this framework yet. In the absence of a controlling state Supreme Court decision, a federal court applying state law must apply the law as it believes the state Supreme Court would apply it. *Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003) (citing *Astaire v. Best Film & Video Crop*, 116 F.3d 1297, 1300 (9th Cir.), *amended by* 136 F.3d 1208 (9th Cir. 1997)). "In other words, a federal district court . . . must predict how the Nevada Supreme Court would decide unresolved issues of state law, using statutes and decisions from other jurisdictions as interpretive aids." *Mirch v. Frank*, 295 F. Supp. 2d 1180, 1183 (D. Nev. 2003).

Under the first step of *Katzberg*, the Court finds no language or history that establishing an affirmative indication of intent to provide or withhold a damages action. Article 1, Section 6 of the Nevada Constitution provides in its entirety: "Excessive bail shall not be required, nor excessive fines imposed, nor shall cruel or unusual punishments be inflicted, nor shall witnesses be unreasonably detained." Nev. Const. art. I, § 6. Like Section 18, this language discloses no intent with regard to a right of action damages. *Mack*, 522 P.3d at 447. And like Section 18, this provision was ratified in 1864 and has not been amended since.

Under the second step, the Court considers several factors to determine whether a damages remedy is "in furtherance of the purpose of the provision" and "needed to assure the effectiveness of the provision." *Mack*, 522 P.3d at 447–48. To answer this question, the Court considers "(1) the nature of the legislative provision, (2) the adequacy of existing remedies, (3) the extent to which a [constitutional] tort action supplements or interferes with existing remedies and enforcement, (4) the significance of the purpose of the provision, (5) the extent of the change in tort law and (6) the burden on the judiciary." *Id.* at 448 (cleaned

10

1  up).

2      These factors favor recognizing an implied right of action for damages.

3  Section 6 is, like Section 18, a significant Constitutional right. Existing

4  alternative remedies like state tort law serve "different interests" than

5  constitutional guarantees. *Id.* at 448 (citing *Bivens v. Six Unknown Named Agents*

6  *of Fed. Bureau of Narcotics*, 403 U.S. 388, 394–95 (1971)). Tort law establishes

7  generally duties between members of the community, while constitutional

8  remedies provide higher standards, because agents of the state must "not only .

9  . . respect the rights of other citizens" but also "*protect and defend* those rights."

10  *Id.* (citation omitted). Rights of action for Section 6 do not interfere with existing

11  remedies and enforcement, and they allow for development of the Nevada

12  Constitution's jurisprudence regarding prisoners' rights. Finally, recognizing a

13  damages action will not place an additional burden on the judiciary because

14  federal courts apply the same legal standards to the cruel and unusual

15  punishment provision in Article 1, Section 6 of the Nevada Constitution as they

16  do to the cruel and unusual provision of the Eighth Amendment to the U.S.

17  Constitution and routinely allow such claims to proceed. *Vickers v. Godecki*, No.

18  2:20-CV-01401-GMN-NJK, 2023 WL 2435110, at *2 (D. Nev. Mar. 8, 2023);

19  *Meeks v. Nevada Dep't of Corr.*, No. 3:18-CV-00431-MMD-WGC, 2020 WL

20  8084979, at *19 (D. Nev. Nov. 10, 2020) (collecting cases), *report and*

21  *recommendation adopted sub nom. Meeks v. Bacca*, No. 3:18-CR-00431-MMD-

22  WGC, 2021 WL 53619 (D. Nev. Jan. 6, 2021).

23      Finally, the Court sees no special factors that would militate against finding

24  an implied right of action for damages under Section 6 where one already exists

25  for Section 18. *See Mack*, 522 P.3d at 449-450.

26      *Mack* does not address claims for injunctive and declaratory relief and the

27  11

28

Court declines to reach that issue. *Id.* at 441. Thus, Cardenas-Ornelas's claims for damages against individual officers in this case may proceed.

### D. ANALYSIS

In their motion for summary judgment, Defendants argue that Cardenas-Ornelas's claim should fail as a matter of law because he cannot establish either the objective or subjective prong of the Eighth Amendment test. (ECF No. 84 at 18.)

First, Defendants argue that Cardenas-Ornelas "has not and cannot establish that a lack of outdoor exercise caused an objectively serious risk of harm." (ECF No. 84 at 16.) However, Ninth circuit caselaw clearly establishes that denial of outdoor exercise for a prolonged period of time meets the objective prong of the Eighth Amendment analysis. *Keenan*, 83 F.3d at 1089; *LeMaire*, 12 F.3d at 1458.

Defendants rely on *Norbert v. City and County of San Francisco* to argue that, because Cardenas-Ornelas "was able to exercise in his cell," he cannot establish objective harm. (ECF No. 84 at 16.) In *Norbert*, the Ninth Circuit explained that "the constitutionality of conditions for inmate exercise must be evaluated based on the full extent of the available recreational opportunities." *Norbert*, 10 F.4th at 930. In that case, administrative segregation inmates received "at least one hour of recreation time seven days a week" between "the day room and gym," and general population inmates were allowed "at least 4.5 hours of total recreation time each day during the week, and at least 8 hours on weekends." *Id.* at 934. However, the facts of this case are more analogous to those in *Toussaint*, where inmates were confined to their cells for 23 hours a day for over one year. *Toussaint*, 722 F.2d at 1492-93. Defendants do not point to any recreation opportunities that Cardenas-Ornelas was given outside his cell, and

do not challenge Cardenas-Ornelas's claim that he was "confined to [his] cell for 23 to 23 ½ hours a day" except when he went to work. (ECF Nos. 84-1 at 74, 1-1 at 13.)

Defendants also fail to provide evidence to counter Cardenas-Ornelas's claim that "except for about 2 hours from when the lockdown began on March 18th, 2020 up to when the defendants began giving Plaintiff 3 hours of yard a week on July 27th, 2021," Plaintiff was "denied all outdoor exercise." (ECF No. 87 at 3.) Defendants argue that it is "absolutely not the case" that Cardenas-Ornelas remained on lockdown for the seven months between May 20, 2020, until December 30, 2020,[1] but have not provided the Court with evidence of what occurred after June 2020. (*See* ECF Nos. 84 at 2-6, 84-1 at 230.) The facts, viewed in the light most favorable to Plaintiff, show that Cardenas-Ornelas was denied all outdoor exercise for over a year, which meets the objective test of the Eighth Amendment analysis.

Defendants next argue that Cardenas-Ornelas's claim should fail because he "cannot show that Defendants knew that the lack of outdoor exercise caused a serious risk of harm." (ECF No. 84 at 16.) Defendants argue that the Covid-19 pandemic was a "life and death emergency" and that the lockdown was

_____

[1] Defendants ask the Court to consider only the time period from March 2020 to December 2020, when Cardenas-Ornelas filed his initial complaint in this case, citing to a private antitrust case that precluded damages arising from acts committed after the filing of the amended complaint. (ECF No. 93 at 13 n.2 (citing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 749 (9th Cir. 2006) (quotations omitted) (emphasis added).) Defendants fail to cite any authority that this rule applies in a § 1983 context and the Ninth Circuit has long recognized that a civil rights plaintiff "who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for *all injuries suffered as a consequence of those deprivations.*" *See Borunda v. Richmond*, 885 F.2d 1384, 1389 (9th Cir. 1988) (emphasis added).

13

1    "reasonably imposed at HDSP to protect inmates from Covid-19." (*Id.* at 17.) The

2    Ninth Circuit has held that in cases of genuine emergency, the temporary

3    deprivation of outdoor exercise may not violate the Eighth Amendment. *Hayward*

4    *v. Procunier*, 629 F.2d 599, 603 (9th Cir. 1980). In that case, the temporary

5    lockdown was imposed after two men were killed in separate acts of gang

6    violence—in a year where twelve people had been killed—and "yard exercise was

7    permitted within a month after the lockdown began, and the normal exercise

8    routine was restored [within six months.]" *Id.* Here, Defendants have offered no

9    evidence explaining when and how yard exercise was restored for inmates,

10   including Cardenas-Ornelas, in Unit 9.

11        Defendants rely on *Norwood v. Vance*, a case which involved a prisoner who

12   was denied outdoor exercise "during four separate extended lockdowns over the

13   course of two years." *Norwood v. Vance*, 591 F.3d 1062, 1065 (9th Cir. 2010).

14   Each lockdown—which lasted between two and four and a half months—was

15   initiated after "serious inmate assaults on staff," and the prisoners were confined

16   to their cells, with all normal programs suspended, "while officers investigated

17   the violence." *Id.* Because the record in that case "[made] clear that a great deal

18   of violence took place during outdoor exercise," the court found that "officials'

19   judgment that there was a greater risk of harm from allowing outdoor exercise

20   was certainly reasonable." *Id.* at 1070.

21        Here, unlike in *Norwood*, Defendants have failed to provide evidence to

22   support a reasonable conclusion that there was a greater risk of harm from

23   allowing outdoor exercise than indoor activities such as work. In their motion for

24   summary judgment, Defendants almost entirely fail to respond to Cardenas-

25   Ornelas's claims that, for much of the time that he was quarantined, Cardenas-

26   Ornelas was required to go to work, where there were at least 130 inmates

14

working together in a warehouse, and where social distancing was impossible. (ECF No. 1-1 at 12.) In their reply to Plaintiff's opposition, Defendants address this argument with an additional declaration by Jeremy Bean, HDSP Warden. (ECF No. 93-1 at 2-4.) Defendants claim that "prison officials balanced the risks of the COVID-19 pandemic against the privileges that had previously been provided to inmates and determined that while yard time would not comport with COVID-19 protocols, inmates could still be afforded the opportunity to work in Prison Industries and earn wages and good time credits." (ECF No. 93 at 14.) Defendants argue that "[t]he level of supervision and affirmative measures to protect inmates from COVID-19 were simply not available in the yard, while Prison Industries had alternative funding to ensure adequate supervision, and a space where COVID-19 protocols could be enforced and where remedial measures, such as a fogger device used to kill COVID-19, could be implemented." (*Id.*)

Defendants' arguments regarding the cost of providing yard time fail to provide adequate justification because the Ninth Circuit has explained that "[t]he cost or inconvenience of providing adequate [exercise] facilities is not a defense to the imposition of a cruel punishment." *Spain*, 600 F.2d at 200. While these arguments provide some justification for the disparity between yard time and work, they do not establish the absence of a genuine dispute of material fact. A rational finder of fact could find that that this after-the-fact justification for the disparity between access to the yard and access to work was pretextual.

Because under these facts, viewed in the light most favorable to Cardenas-Ornelas, a rational finder of fact could find that Defendants were deliberately indifferent by intentionally and unnecessarily denying Cardenas-Ornelas outdoor exercise, summary judgment is inappropriate as to Plaintiff's Eighth Amendment

and state constitutional claims on the basis of denial of yard time.

### E. PERSONAL PARTICIPATION

Defendants also argue that Cardenas-Ornelas cannot establish that Defendants personally participated in any constitutional violation because each Defendant was "merely following the policies and procedures set forth by the NDOC Medical Director." (ECF No. 84 at 22.)

A defendant is liable under § 1983 "only upon a showing of personal participation by the defendant." *Farmer*, 511 U.S. at 844. "A supervisor is only liable for the constitutional violations of . . . subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citations omitted). "The requisite causal connection can be established . . . by setting in motion a series of acts by others or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Rodriguez*, 891 F.3d at 798 (quoting *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)). A showing that a supervisor acted, or failed to act, in a manner that was deliberately indifferent to an inmate's Eighth Amendment rights is sufficient to demonstrate the involvement—and the liability—of that supervisor. *Starr*, 652 F.3d at 1206–07.

The Ninth Circuit has held that a defendant can personally participate in a violation by denying a grievance. *Colwell v. Bannister*, 763 F.3d 1060, 1070 (9th Cir. 2014); *see Jackson v. Nevada*, No. 216CV00995APGNJK, 2019 WL 6499106, at *7 (D. Nev. Dec. 3, 2019), *aff'd*, No. 20-15007, 2022 WL 16756349 (9th Cir. Nov. 8, 2022). In *Snow v. McDaniel*, the Ninth Circuit denied summary judgment to a prison warden and associate warden because they were aware, through the grievance process and other documentation, that the prisoner needed surgery

16

1    and they "failed to act to prevent future harm." *Snow v. McDaniel*, 681 F.3d 978,

2    989 (9th Cir. 2012), *overruled on other grounds in Peralta v. Dillard*, 744 F.3d

3    1076, 1083-84 (9th Cir. 2014).

4        Defendants point to *Peralta v. Dillard*, a case which involved a claim of

5    deliberate indifference to serious medical needs against a prison's chief dental

6    officer, chief medical officer, and staff dentist. *Peralta v. Dillard*, 744 F.3d 1076,

7    1081 (9th Cir. 2014). The Ninth Circuit found that neither the chief dental officer

8    nor the chief medical officer was deliberately indifferent because both were

9    administrators who signed appeals and did not personally participate in the

10   prisoner's treatment. *Id.* at 1086-87. Here, Defendants argue that they "are not

11   doctors and therefore were not required to second guess the Medical Director's

12   judgment on how best to respond to the Covid-19 pandemic." (ECF No. 84 at 22.)

13       However, the administrators in *Peralta* were not officers or wardens

14   interacting with the prisoners—as is the case here—but supervisors who were

15   not aware of the prisoner's complaints, who had not directly interacted with the

16   prisoner, and whose only involvement was the signing of second-level appeals.

17   *Peralta*, 744 F.3d at 1086-87. The "medical judgments" discussed in *Peralta* were

18   made not by a high-level medical officer, but by a staff dentist who treated the

19   prisoner. *Id.* at 1086. Furthermore, *Peralta* did not involve a motion for summary

20   judgment, but a motion for judgment as a matter of law after a jury trial. *Id.* at

21   1085. The court explained that, because the jury had found that the staff dentist

22   was not liable, "the jury essentially resolved the question of [the chief dental

23   officer and the chief medical officer's] liability as well." *Id.* at 1088. If Cardenas-

24   Ornelas were bringing this lawsuit against NDOC's chief medical officer, and had

25   already had a jury trial, *Peralta* might be applicable, but on the facts and

26   procedural posture here, it is not. Finally, *Peralta* does not change the holding in

27                                                                    17

28

*Snow* that, while a supervisor cannot be held vicariously liable, a supervisor can be liable as a participant based on knowledge and failure to act. *Snow,* 681 F.3d at 989.

### i.  Warden Johnson

Defendant Warden Johnson was warden of HDSP in 2020. (ECF No. 84-1 at 227.) In this role, he was "responsible for overseeing all aspects of HDSP, including overseeing NDOC policies, practices and procedures implemented at HDSP" and "overseeing the implementation of all medical protocols issued by the NDOC Medical Director[.]" (*Id.*) Cardenas-Ornelas claims that Warden Johnson was among the individuals who decided to quarantine Unit 9 in March 2020. (ECF Nos. 1-1 at 12, 12 at 11.) However, this occurred before Warden Johnson started his employment as warden as HDSP. (ECF No. 84-1 at 227, 229.)  Warden Johnson states that lockdown decisions were made "for the protection [of] inmates and staff alike," but does not address the discrepancy between denial of yard time and authorization to work. (*Id.* at 229.) Warden Johnson's declaration does not include any statements regarding quarantines imposed after June 2020. (*See id.* at 227-230.) On August 20, 2020, Warden Johnson denied Cardenas-Ornelas's first level grievance regarding denial of yard time. (ECF No. 84-1 at 75, 229.) In that response, Warden Johnson admits that "Unit 9 inmate workers received authorization to return to work as early as April 27, 2020." (ECF No. 84-1 at 75.)

Warden Johnson personally reviewed and denied Cardenas-Ornelas's first level grievance, and the evidence suggests that Warden Johnson had authority to resolve the underlying issue. While Warden Johnson may not have been responsible for the first quarantine decision in March 2020, he had authority in overseeing and implementing the Covid-19 regulations. (ECF No. 84-1 at 227.)

1   Therefore, Warden Johnson is an appropriate defendant and summary judgment

2   in his favor on this count is denied.

3        **ii.**  **Struck**

4      In 2020, Defendant Struck was a correctional sergeant assigned to the

5   visiting department at HDSP. (ECF No. 84-1 at 260.) In this role, his

6   responsibilities included "supervision of staff under [his] command, supervision,

7   custody, security, discipline, safety offenders, the security of safety and staff, and

8   the security and safety of the institution to which [he is] assigned." (*Id.*) Cardenas-

9   Ornelas claims that Struck was among the individuals who decided to quarantine

10   Unit 9 in March 2020. (ECF Nos. 1-1 at 12, 12 at 11.) Struck states that the

11   Covid-19 protocols were communicated to him through the chain of command

12   and that as correctional sergeant, he was required to and followed the protocols

13   as directed. (ECF No. 84-1 at 235.) In July 2020, Struck responded to Cardenas-

14   Ornelas's informal grievance regarding denial of yard time on health and safety

15   grounds. (ECF No. 74 at 262.) Struck claims that in 2020, he "never denied

16   Cardenas-Ornelas's access to scheduled yard time, except when required by the

17   established Covid-19 protocols[.]" (ECF No. 84-1 at 236.)

18      Because Cardenas-Ornelas has not provided sufficient evidence showing

19   that Struck had authority over implementing the Covid-19 protocols, Struck is

20   entitled to summary judgment on this count.

21        **iii.**  **Portillo**

22      In 2020, Defendant Portillo was a correctional lieutenant at HDSP, whose

23   responsibilities included "supervision of staff under [his] command, supervision,

24   custody, security, discipline, safety offenders, the security and safety of staff, and

25   the security and safety of the institution to which [he is] assigned." (ECF No. 84-

26   1 at 255.) Cardenas-Ornelas claims that Portillo was responsible for deciding to

27   19

28

quarantine Unit 9 on March 18, 2020 and that Cardenas-Ornelas had multiple conversations with Portillo regarding the issue of denial of yard time. (ECF Nos. 1-1 at 12, 12 at 11.) Portillo's declaration does not admit or deny these conversations. (S*ee* ECF No. 84-1 at 255-56.)  In his declaration, Portillo explains that "[b]eginning in March 2020, the NDOC Medical Director established specific protocols for addressing COVID-19, which were implemented by the NDOC Director, Chief of Nursing, and the warden at HDSP." (ECF No. 84-1 at 255.) These protocols were "communicated to Portillo through the chain of command, town hall meetings, memos, and emails" and, as correctional lieutenant, Portillo was required to and followed these protocols as directed. (*Id.*) Portillo states that in 2020, he "never denied Cardenas-Ornelas's access to scheduled yard time, except when required by the established Covid-19 protocols." (ECF No. 84-1 at 255.)

Because Cardenas-Ornelas has not provided evidence showing that Portillo had authority over implementing the Covid-19 protocols or responded to any of the relevant grievances, Portillo is entitled to summary judgment on this count.

### iv.   Owens

In 2020, Defendant Owens was a lieutenant at HDSP, whose responsibilities included "supervision of staff under [his] command, supervision, custody, security, discipline, safety offenders, the security and safety of staff, and the security and safety of the institution[.]" (ECF No. 84-1 at 261.) Cardenas-Ornelas claims that he had multiple conversations with Owens regarding the issue of denial of yard time. (ECF Nos. 1-1 at 12, 12 at 11.) Owens does not admit or deny these conversations. (*See* ECF No. 84-1 at 261-62.) In his declaration, Owens states that the Covid-19 protocols were communicated to him through the chain of command and that as lieutenant, he was required to and followed those

protocols as directed. (*Id.*) Owens claims that the only interaction he had with Cardenas-Ornelas was "responding to a grievance concerning his legal mail." (*Id.*) Owens also states that as lieutenant, he had "no control or input over phone access or tier, yard, chapel, and law library schedules at HDSP." (*Id.*)

Because Cardenas-Ornelas has not provided evidence showing that Owens had any decision-making authority regarding Cardenas-Ornelas's yard time and was involved in relevant grievance responses, Owens is entitled to summary judgment on this count.

### v.   Piccinini

From May 2020, Defendant Piccinini was an associate warden at HDSP. (ECF No. 84-1 at 258.) In this role, his responsibilities included "supervision of staff and programs at HDSP, supervision, custody, security, discipline, safety offenders, the security and safety of staff, and the security and safety of HDSP." (*Id.*) Cardenas-Ornelas claims that Piccinini was among the individuals who decided to quarantine Unit 9 in March 2020. (ECF Nos. 1-1 at 12, 12 at 11.)

Like other defendants, Piccinini states that the Covid-19 protocols were communicated to him through the chain of command and that as associate warden, he was required to and followed the protocols as directed. (*Id.*) Piccinini also states that as associate warden, he had "no responsibility over phone access or tier, yard, chapel, and law library schedules at HDSP, and therefore did not deny Cardenas-Ornelas access to . . . the yard." (*Id.*) Piccinini also states that the only interaction he had with Plaintiff was "responding to certain grievances which are not at issue in this lawsuit." (*Id.*) Although Cardenas-Ornelas claims that Piccinini denied several grievances, it does not appear that he had a role in the grievances submitted to this Court. (*See* ECF No. 84-1 at 64-79.) In his response to Defendants' motion for summary judgment, Cardenas-Ornelas does not

21

provide further evidence regarding Piccinini's role in the relevant events. (*See* ECF No. 87.)

Because Cardenas-Ornelas has not provided any evidence that Piccinini had decision-making authority regarding Cardenas-Ornelas's yard time and was not involved in the grievance responses, Piccinini is entitled to summary judgment on this count.

### F. QUALIFIED IMMUNITY

Finally, Defendants argue that all Cardenas-Ornelas's claims are barred by qualified immunity. (ECF No. 84 at 23.) Defendants argue that Cardenas-Ornelas "cannot meet his burden of showing that Defendants violated any right, much less a right that was clearly established," but do not offer any arguments as to why they are entitled to qualified immunity on this count. (*Id.*)

As explained above, there are genuine disputes of material fact as to whether Warden Johnson violated Cardenas-Ornelas's Eighth Amendment rights by denying him outdoor exercise for a prolonged period. And Ninth Circuit case law as of 2020 clearly established that complete deprivation of outdoor exercise for prolonged periods of time constituted an objectively serious deprivation under the Eighth Amendment. *See Spain,* 600 F.2d 189 at 199; *LeMaire,* 12 F.3d at 1457; *Allen,* 40 F.3d 1001. Therefore, Warden Johnson is not entitled to qualified immunity on this count.

### IV. COUNT 2B: DENIAL OF YARD TIME

#### A. EXHAUSTION

Defendants argue that Cardenas-Ornelas's equal protection claim is barred because he failed to exhaust his administrative remedies. (ECF Nos. 84 at 9, 93 at 6.) NDOC Administrative Regulation (AR) 740 requires inmates to complete a three-step grievance procedure, which includes an informal grievance, a first-

1   level grievance, and a second-level grievance. AR 740.08-10.

2       Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be
3   brought with respect to prison conditions under … [42 U.S.C. § 1983], or any
4   other Federal law, by a prisoner confined in any jail, prison, or other correctional
5   facility until such administrative remedies as are available are exhausted." 42
6   U.S.C. § 1997e(a). The PLRA requires "proper exhaustion" of an inmate's claims.
7   *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). This means that "a prisoner must
8   complete the administrative review process in accordance with the applicable
9   procedural rules, including deadlines, as a precondition to bringing suit in federal
10  court." *Woodford*, 548 U.S. at 88.

11      The only limit to § 1997e(a)'s mandate is the one in its text: An inmate need
12  exhaust only such administrative remedies as are "'available.'" *Ross v. Blake*, 578
13  U.S. 632, 648 (2016). The PLRA does not require exhaustion when circumstances
14  render administrative remedies "effectively unavailable." See *Eaton v. Blewett,* 50
15  F.4th 1240, 1245 (9th Cir. 2022); *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir.
16  2015) (as amended) ("[F]ailure to exhaust a remedy that is effectively unavailable
17  does not bar a claim from being heard in federal court.") "[W]here inmates take
18  reasonably appropriate steps to exhaust but are precluded from doing so by a
19  prison's erroneous failure to process the grievance, [the court has] deemed the
20  exhaustion requirement satisfied." *Fordley v. Lizarraga*, 18 F.4th 344, 352 (9th
21  Cir. 2021).

22      The failure to exhaust administrative remedies is "an affirmative defense
23  the defendant must plead and prove." *Jones v. Bock*, 549 U.S. 199, 204, 216
24  (2007). The defendant bears the burden of proving that an available
25  administrative remedy was not exhausted. *Albino v. Baca*, 747 F.3d 1162, 1172
26  (9th Cir. 2014). If the defendant makes that showing, the burden shifts to the

27                                      23

28

inmate to "show there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him by 'showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.'" *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (quoting *Albino*, 747 F.3d at 1172).

A motion for summary judgment is typically the appropriate vehicle to determine whether an inmate has properly exhausted their administrative remedies. *Albino*, 747 F.3d at 1169. "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56." *Id.* at 1166. But "[i]f material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." *Id.*

The record indicates that Plaintiff complained in an informal grievance, numbered 20063103224, on June 12, 2020 about protective custody inmates being denied equal protection of the laws by being denied yard time when other prison populations were being given yard time during Covid-19. (ECF No. 84-1 at 74, 82-84.) This grievance was responded to and denied. (*Id.* at 74, 85.) Plaintiff then filed a first level grievance regarding the same issue on August 6, 2020. (*Id.* at 82.) This was responded to and denied. (*Id.* at 75, 81.) Plaintiff then attempted to submit a second level grievance on August 28, 2024. (*Id.* at 118.) An Improper Grievance Memo states that this grievance was rejected because Plaintiff failed to attach a "DOC 3098 Improper Grievance Memo" to the grievance. (*Id.* at 117.) Handwritten on the Improper Grievance Memo it says "HDSP Officials have possession of this DOC 3089 already" and "I am unable to submit documents because HDSP officials have possession..." above what appears to be Plaintiff's signature. (*Id.*) It appears that Plaintiff submitted another second level grievance

on October 16, 2020, which was rejected as improper, stating, stating that a Second Level had already been submitted, and to "Please be patient and wait for an official response to your Second Level Grievance under this log number." (Id. at 119-20.) Plaintiff's second level grievance was responded to on November 11, 2020, and was denied. (*Id.* at 76.)

The record is sufficient to create a genuine dispute as to whether Cardenas-Ornelas exhausted his remedies as to his equal protection claim. Thus, Defendants' motion for summary judgment on the basis of exhaustion is denied as to Count 2B.

## B. EQUAL PROTECTION

"To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (citation and internal quotation marks omitted). To establish a violation of the Equal Protection Clause, the prisoner must present evidence of discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 239–40 (1976); *Serrano*, 345 F.3d at 1082.

This Court allowed Cardenas-Ornelas to proceed with an equal protection claim that Defendants Portillo, Owens, Warden Johnson, Struck, and Piccinini provided other inmates at HDSP with yard time while denying Plaintiff yard time, and used Covid-19 as a baseless pretext to do so. (ECF No. 12 at 15-16.) Cardenas-Ornelas claims that while his unit was denied yard time, Defendants permitted "every other [unit] within the NDOC to continue receiving exercise, including General Population, Administrative and disciplinary segregation units." (ECF No. 1-1 at 15.) The restrictions applied only to "inmates housed in protective

25

segregation, and restrictions were imposed only on those activities which benefited the inmates." (*Id.* at 15-16.) Cardenas-Ornelas further alleges that he has been "told by a number of officers, including Portillo, that Warden Johnson does not like protective segregation ("P.S.") inmates, and that this allows him to lock down the P.S. units." (*Id.* at 16.)

Defendants argue that Cardenas-Ornelas was not treated differently because prisoners were all restricted from accessing the yard when any prisoner in that unit had contracted Covid-19. (ECF No. 12 at 14.) Defendants argue that Cardenas-Ornelas has provided no evidence that Defendants treated him differently than other inmates in units exposed to Covid-19; and that when they did deny yard time, they had a rational basis for doing so: "Defendants were attempting to prevent the spread of Covid-19." (ECF No. 84 at 14.) However, the only evidence that Defendants provide in their motion for summary judgment is the declaration of Warden Johnson. (*See* ECF No. 84 at 13-14.) Warden Johnson's declaration explains that "by June 23, 2020, inmates in units who did not have persons suspected of contacted Covid-19 were permitted to resume yard time," but that Unit 9 remained in quarantine "based on inmates in that unit having tested positive for Covid-19." (ECF No. 84-1 at 230.) Warden Johnson states that "Units were quarantined based on whether inmates in that Unit tested positive for Covid-19, and therefore all inmates were treated equally." (*Id.*) Warden Johnson does not explain when members of Unit 9 were allowed out of quarantine. (*See id.*) Defendants do not provide evidence to contradict Cardenas-Ornelas's claim that he was not allowed yard time until more than a year later on July 27, 2021.

Defendants point to *Seaplane Adventures, LLC v. County of Marin*, where the Ninth Circuit held that a county's public health order restricting recreational

26

flights during the Covid-19 pandemic did not violate a seaplane operator's equal protection rights. *Seaplane Adventures, LLC v. Cnty. of Marin*, 71 F.4th 724, 731 (9th Cir. 2023). As Defendants point out, the Ninth Circuit in *Seaplane* explained that under an equal protection "class of one" claim, a plaintiff must demonstrate that the defendant "(1) intentionally (2) treated [plaintiff] differently than other similarly situated [individuals or groups], (3) without a rational basis." *Id.* at 729 (citing *Gerhart v. Lake Cnty.*, 637 F.3d 1013, 1022 (9th Cir. 2011)). To preclude a grant of summary judgment, the plaintiff must show that "a rational trier of fact could find for [plaintiff] on all three prongs of the 'class of one' claim.'" *Id.* at 729-30.

Defendants argue that the facts here are analogous to those in *Seaplane*, and that Defendants' restriction of "non-essential activities to prevent the spread of Covid-19 clearly satisfies the rational basis test." (ECF No. 84 at 14.) However, this argument fails to address Cardenas-Ornelas's claims that prisoners were allowed to work in crowded conditions indoors while being denied access to outdoor exercise for a prolonged period. In *Seaplane*, evidence in the record showed that the defendant had "ample bases for making the distinction" between recreational and non-recreational flights and banning only the former. *Seaplane*, 71 F.4th at 731. As explained above, Defendants' arguments justifying the disparity between yard time and work fail to establish the absence of a genuine dispute of material fact. Here, a rational trier of fact could find that Defendants' reasons for denying Cardenas-Ornelas and Unit 9 outdoor exercise were pretextual and lacked rational basis, based on the evidence Cardenas-Ornelas has provided regarding his return to work. A rational trier of fact could also find that Defendants treated Cardenas-Ornelas and Unit 9 differently than other similarly situated groups, namely inmates in general population, administrative

and disciplinary segregation. Finally, a rational trier of fact could find that this different treatment was intentional, based on Cardenas's claims regarding Warden Johnson's dislike of protective segregation inmates and Defendants' failure to refute these claims.

### C. PARTICIPATION

Defendants offer the same arguments regarding participation for this count as the first. (ECF No. 84 at 22.) For similar reasons, the Court grants summary judgment for defendants Portillo, Owens, Struck, and Piccinini, but denies summary judgment for defendant Warden Johnson on this basis.

While Plaintiff alleges that he had many conversations regarding this issue with Defendants Portillo and Owens, and that all Defendants implemented the lockdown program depriving him of yard time, there is no indication that any Defendants besides Warden Johnson had authority in implementing this policy. (ECF No. 1-1 at 12, 16). The record indicates that Struck responded to Plaintiff's first level grievance with regard to denial of outdoor exercise. (ECF No. 84-1 at 74.) It also indicates that Piccinini authored multiple "Improper Grievance Memos" to Plaintiff related to this claim. (*Id.* at 100, 105, 117, 119.) While his role is unclear, Portillo's name appears on one of Plaintiff's first level grievances. (*Id.* at 122.)

Because Plaintiff has not presented any evidence that these Defendants participated in any manner beyond implementation of a policy that they had no authority to change and responding to grievances, there is no genuine dispute of fact as to their personal participation. "Where the defendant's only involvement in the allegedly unconstitutional conduct is 'the denial of administrative grievances or the failure to act, the defendant cannot be liable under § 1983.'" *Grenning v. Klemme*, 34 F. Supp. 3d 1144, 1157 (E.D. Wash.2014) (quoting

*Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)); *see also Jackson, v. State of Nevada*, No. 2:16-cv-00995-APG-NJK, 2019 WL 6499106, at \*7 (D. Nev. Dec. 3, 2019)("[M]erely denying a grievance without some decision-making authority or ability to resolve the underlying issue grieved is not enough to establish personal participation.")

Accordingly, the Court grants summary judgment for Defendants Portillo, Owens, Struck, and Piccini on this claim but denies summary judgment as to Warden Johnson.

### D. QUALIFIED IMMUNITY

Defendants make the same general argument regarding qualified immunity for all claims. (ECF No. 84 at 23.) As discussed above, there are genuine disputes of material fact as to whether Warden Johnson violated Cardenas-Ornelas's equal protection right by denying Cardenas-Ornelas's unit access to the yard while allowing other units access to the yard. Furthermore, it is clearly established that a prisoner can assert a class-of-one equal protection claim by showing they were treated differently from other similarly situated prisoners and that there was no rational basis for the difference in treatment. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Therefore, Defendant Warden Johnson is not entitled to summary judgment on this claim on this basis.

### V. COUNT 4: COVID-19 COME TO WORK POLICY

#### A. EXHAUSTION

Defendants argue that Plaintiff's Eighth Amendment claim alleging a policy requiring officers to come to work after having reported contact with individuals who had contracted Covid-19 is barred because he failed to exhaust his administrative remedies. (ECF No. 84 at 9.)

Upon review of the grievance records (ECF No. 84-1), it does not appear

1  that Plaintiff brought any grievances regarding a policy requiring officers to come
2  to work after having been exposed to COVID-19.

3      Because Defendants have met their burden of showing an absence of
4  genuine dispute of fact on this issue, the claim is dismissed. The Court grants
5  Defendants' motion for summary judgment on Count 4.

6  ## VI. COUNT 5: MAIL DELAY

7      The Court allowed Cardenas-Ornelas to proceed with his claim that Officer
8  Johnson deliberately interfered with the delivery of his mail in February 2020.
9  (ECF No. 12 at 26.) Plaintiff alleges that Officer Johnson delivered mail from his
10  attorney dated February 4 on February 21—a delay of approximately 17 days—
11  interfering with Plaintiff's ability to contact his lawyer and satisfy a judge's order
12  to timely comply with an order. (ECF No. 12 at 23-24.) As a result of Johnson's
13  failure to provide the legal mail within the 24-hour required period, Plaintiff
14  claims that he was unable to properly research and write a response. (ECF No.
15  12 at 24.)

16      Defendants argue that Plaintiff has "no admissible evidence that Officer
17  Johnson withheld his legal mail" because the mail was received at HDSP on
18  February 20 and Officer Johnson delivered the mail to Plaintiff on February 21.
19  (ECF No. 84 at 20.)

20      The record shows that the letter from Plaintiff's attorney, David K. Neidert,
21  was dated February 4, 2020. (ECF No. 87-1 at 80.) In the letter, Mr. Neidert
22  informed Plaintiff that because of a decision by Judge Du on January 31, 2020,
23  Plaintiff had 30 days to take action to avoid dismissal of his case. (*Id.*) Because
24  Judge Du had found that one of Plaintiff's claims was unexhausted in state court,
25  Mr. Neidert explained that Plaintiff could do one of two things to avoid dismissal
26  (which would be "catastrophic to [his] case.") (*Id.*) Mr. Neidert asked Plaintiff to

27

28

30

1  sign the document enclosed so that he could file it with the court to "get your
2  petition moving again." (*Id.* at 81.)

3      The stamp on the envelope was dated February 4, 2020. (*Id.* at 76.) In
4  Warden Johnson's response to Plaintiff's grievance, he explains that this is a
5  "printed stamp which identifies when the stamp was printed, not mailed." (ECF
6  No. 84-1 at 78.) The NDOC legal form does not show when the mail was received
7  by HDSP. (*Id.*) The form indicates that the mail was received by Cardenas-Ornelas
8  on February 21, 2020. (*Id.*)

9      In an informal grievance filed March 5, 2020, Plaintiff complained about
10  the delay as being in violation of administrative regulations and his "First
11  Amendment right to be free from interference of access to Courts." (ECF No. 84-
12  1 at 77.) The grievance was denied, and Cardenas-Ornelas filed a first level
13  grievance reiterating his complaint. (*Id.*) Warden Johnson responded to that
14  grievance, admitting that the officer "did not follow protocol as he failed to date
15  stamp the envelope [] upon receipt at [HDSP]." (*Id.* at 78.) Warden Johnson stated
16  that this was "unacceptable" and would result in the officer receiving "training to
17  ensure he clearly understands Department Policy and his responsibility to ensure
18  he properly processes incoming mail[.]" (*Id.*) Because there was no date stamp on
19  the envelope, Warden Johnson was "unable to prove or disprove [Plaintiff's] claim"
20  that the letter for held for more than twenty-four hours. (*Id.*) Warden Johnson
21  also did not identify the officer involved by name. (*Id.*)

22      In his declaration, Officer Johnson asserts that in February 2020, he had
23  "no responsibility for processing incoming mail or logging incoming mail." He
24  further states that he "delivered mail to inmates on the same day [he] received it"
25  and "never delayed delivering legal mail, but followed the guidelines set forth in
26  NDOC AR 722 and 750." (ECF No. 84-1 at 225.)

27                                              31

28

The record does not clearly establish whether the delay occurred before the letter arrived at HDSP or after the letter arrived; whether Officer Johnson or another officer was responsible for the failure to stamp the mail upon receipt; or (if the letter arrived at HDSP before February 20) whether Officer Johnson or another officer was responsible for the delay. But viewing the facts in the light most favorable to Cardenas-Ornelas, a rational finder of fact could conclude that Officer Johnson delayed delivery of Plaintiff's legal mail.

### A. FIRST AMENDMENT

Prisoners have "a First Amendment right to send and receive mail." *Witherow v. Paff,* 52 F.3d 264, 265 (9th Cir. 1995) (per curiam). Prisoners also have a constitutional right of access to the courts. *See Lewis v. Casey*, 518 U.S. 343, 346 (1996). To establish a violation of the right of access to the courts, a prisoner must establish that he or she has suffered an actual injury. See *Lewis*, 518 U.S. at 349; *Nasby v. Nevada*, 79 F.4th 1062, 1056 (9th Cir. 2023); *Madrid v. Gomez*, 190 F.3d 990, 996 (9th Cir. 1999).

Defendants point to two Ninth Circuit cases finding that incidents of mishandling or delaying mail did not violate the First Amendment. (ECF No. 84 at 20.) In *Crofton*, the court found that a temporary delay of the plaintiff's publications, resulting from the prison official's security inspection, did not violate his First Amendment rights. *Crofton v. Roe*, 170 F.3d 957, 961 (9th Cir. 1999). In *Stevenson*, the court found that a prison official's conduct in handing legal mail to a guard, who then opened the mail outside the inmate's presence, was negligent but not unconstitutional. *Stevenson v. Koskey*, 877 F.2d 1435, 1441 (9th Cir. 1989). Both cases are distinguishable from the facts of this case, which involve the alleged *delay* of *legal* mail.

Defendants also argue that Cardenas-Ornelas cannot establish that Officer

32

Johnson's delay caused actual harm. (ECF No. 84 at 21.) In his complaint, Cardenas-Ornelas argues that this delay meant that Plaintiff was "unable to properly research and write a response." (ECF No. 1-1 at 31.) This was "made worse by the fact that he could not get an appointment with the law library." (*Id.*) In his response to their motion for summary judgment, Cardenas-Ornelas reiterates his access to court claim, but does not argue that the delay caused harm. (*See* ECF No. 1-1 at 16.) Cardenas-Ornelas does not claim that he was unable to respond to his attorney or the court before the required deadline, or that the delay resulted in an adverse ruling.

Because Cardenas-Ornelas has failed to allege facts sufficient to create a genuine dispute of material fact as to whether the delay in receiving his legal mail resulted in actual harm, Defendants' motion for summary judgment on Count 5 is granted.

## VII.    COUNT 6A: PHONE CALL BAN

### A. EXHAUSTION

Defendants argue that Plaintiff's federal and state claims regarding a ban on phone calls are barred because he failed to exhaust his administrative remedies. (ECF No. 84 at 9.)

Upon review of the grievance records (ECF No. 84-1), it does not appear that Plaintiff brought any grievances regarding a ban on phone calls.

Because Defendants have met their burden of showing an absence of genuine dispute of fact on this issue, the claim is dismissed. The Court grants Defendants' motion for summary judgment on Count 6A.

## VIII.    COUNT 6B: PHONE CALL BAN

### A. EXHAUSTION

Defendants argue that Plaintiff's equal protection claims regarding denial

of phone calls are barred because he failed to exhaust his administrative remedies. (ECF No. 84 at 9.)

Upon review of the grievance records (ECF No. 84-1), it does not appear that Plaintiff brought any grievances regarding the denial of phone calls.

Because Defendants have met their burden of showing an absence of genuine dispute of fact on this issue the Court grants Defendants' motion summary judgment on Count 6B.

## IX.    CONCLUSION

It is therefore ordered that Defendants' motion for summary judgment (ECF No. 84) is DENIED as to Plaintiff's Eighth Amendment and Equal Protection claims regarding denial of outdoor exercise (Counts 2A and 2B) against Warden Johnson, and GRANTED as to Defendants Portillo, Owens, Struck, and Piccinini.

Defendants' motion for summary judgment (ECF No. 84) is GRANTED as to Plaintiff's other claims (Counts 4, 5, 6A, and 6B).

Plaintiff's claim regarding deprivation of outdoor exercise in violation of the Eighth Amendment and Equal Protection clause (Counts 2A and 2B) will proceed against Defendant Warden Johnson. All other Defendants are dismissed from this case.

DATED THIS 30th day of September 2024.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

34